CASE 6—PETITION ORDINARY—DECEMBER 11.

# Corbin vs. Marsh.

### APPEAL FROM NICHOLAS CIRCUIT COURT.

1. The act of Congress for emancipating the wives and children of slaves volunteering as soldiers in the Federal army, is unconstitutional.

2. The Constitution of the United States is, at all times and under all circumstances, the supreme law over citizens, the States, and the national government in all its departments and operations, military as well as civil, in war as in peace.

3. Martial law cannot suspend the constitution as the guardian of the person and property of a private citizen who is not an enemy to the government, and has been guilty of no hostile act.

4. Wherever slavery was legalized, a slave was as much property as land, and could no more be taken for public use, without compensation, than any other property.

5. A citizen, whose property has been taken for public use, without compensation, retains the title and the incidental right of recapture, unless, in a reasonable time, the value shall have been legally fixed and paid. (4 *Wash. C. C. R.*, 1 *Baldwin*, 203; 2 *Johns. Ch. Rep.*, 162.)

W. NORVELL, for appellant, cited *Const. U. S.*, art. 1, sec. 8.

G. & R. T. DAVIS for appellees.

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT:

The single question presented for judicial consideration in this case, is the controverted constitutionality of the act of Congress for emancipating the wives and children of slaves volunteering as soldiers in the Federal army.

The circuit court adjudged that this emancipating provision is unconstitutional, and, consequently, *not law;* and a majority of this court, *Judge Williams* dissenting, concur in that judgment.

At the threshold of this mere framework of an argument, which we intend to be as brief and condensed as the subject will allow, we premise that the Constitution of the United States, in its declared and necessary supremacy, is the same fundamental, paramount, and inviolable *law* of the sovereign people, at all times and under all circumstances—that it is supreme over all—the citizens, the States, and the national

government in all its departments and operations, military as well as civil—and that it is as supreme in war as in peace.

These we consider axiomatic truths; and we believe that none of them, except, perhaps, the last, will be denied by any statesman or jurist. But there seem to be a few of that denomination who assume that, in war, the Constitution is either totally or essentially suspended or paralyzed; and these alone practically deny its coequal supremacy in peace and in war. But this assumed exception from its vital operation *at all times* appears to us a self-evident heresy, as indefensible in principle as it would be despotic in practice.

The people, in adopting the Constitution, made no such nullifying exception, and they were too wise to contemplate its suspension in war *further than they then provided for it.* And, therefore, to silence all doubt as to either its rightful supremacy or the universal and incessant prevalence of it until changed in the mode they therein prescribed, they labeled its bosom with the precautionary and *unqualified* stereotype—"THIS CONSTITUTION SHALL BE THE SUPREME LAW OF THE LAND." Supreme law, when? *Always.* Where? Everywhere in the Union. *It neither imports nor allows any exception.* As the Constitution was made to secure liberty and property against arbitrary and ambitious power, its guarantees are most needful when there is most danger of the assumption of any such power; and when, therefore, the safety of the people needs their only protection most. Can this be denied or doubted? Surely not. Then the Constitution was made even more for the turbulence of war than the calm of peace. And, prudently contemplating seasons of war, it gave to the general government all the powers deemed necessary or safe for upholding its own supremacy, preventing usurpation, and maintaining the Union in war as well as in peace.

But as belligerent exigencies are, to some extent, peculiar, the Constitution, as far as deemed proper or safe, made some express exceptions providing for them and corresponding with them. And if, as thus moulded and finished, its powers are insufficient for the ordeal of war in any of its

forms, it is an abortion, and should be remoulded and made, if possible, more adaptable to all emergencies and times. This, however, is the work, not of the government nor of its armies, in whose hands it would be a revolutionary job of usurpation, but it is the rightful task of *their* sovereigns, the constituent and peaceful people. And we cannot doubt that, even in war, the faithful observance of the Constitution, in all its normal vitality, would be much more auspicious to success than a reckless breach of it by the official sentinels sworn to guard it.

In delegating the war power to Congress, the framers of the Constitution moulded it for a state of war, as far as they thought either necessary or safe. But, in leaving, as they did, a large margin for the contingent exercise of belligerent rights of international usage and recognition, which are extra-constitutional, or, in other words, not conferred by the Constitution, they never contemplated the exercise of any belligerent power conflicting with the limitations or the guaranties which they were careful to adopt as fundamental securities of liberty and property against all subordinate power, whether civil or military. Even martial law, truly defined, cannot suspend the Constitution as the guardian of the person and property of a private citizen who is not an enemy to the government, nor has been guilty of no hostile act.

It is a radical and most pestilent error, far too prevalent, to assume that the belligerent powers of our Federal government, as controlled and circumscribed by its Constitution, are just what that class of powers may be admitted to be, theoretically, in European governments, unfettered by any fundamental and paramount law.

What the Constitution prohibits, war cannot legalize. The only safe or consistent conclusion is, that neither Congress nor its army can possess any belligerent power inconsistent with the fundamental law, which is as supreme over them as it is over citizens and courts.

When the Constitution declared that "*private property shall not be taken for public use without just compensation*," it undoubt-

edly meant that it should *never* be so taken; and that, if ever so taken, the act should be void, and never divest the owner of his pre-existing and still subsisting title. No other interpretation can be consistently adopted or safely countenanced; for any other would frustrate the object of the guarantee, install anarchy, and only mock the deluded citizen.

Whatever may be the belligerent rights of more absolute governments, our limited government can have no belligerent power to take from the loyal owner of private property, for *any* public use, his title, without a full indemnity. It would be inexplicably strange and inconsistent to admit, as all do, that Congress cannot, in time of peace, take private property for public use without just compensation, and, nevertheless, to claim, as some seem to do, the power to take it without any compensation in time of war, when all such property is in most danger of spoliation, and in most need of the protection of this boasted *palladium*. This cannot be the insane genius of the Constitution which our hearts so much love, and for which so much patriotic blood has been shed. No. All its guarantees to private loyal citizens are as authoritative in war as in peace. This is the only sound or admissible theory.

And, so understanding the Constitution, we will so apply it to this case.

Where slavery is legalized, a slave is legal, substantive, and appreciable property, as much entitled to the protection of the Constitution as land, or any other property, movable or immovable.

Joe's wife, being the property of the appellee, when she was taken from him, could not have been lawfully taken without compensation to the owner. The act of Congress, under pretense of which she left her owner and engaged, as a free woman, in the service of the appellent (against whom the appellee obtained the judgment herein appealed from), not only offered no compensation, but manifested a fixed decision to allow none.

Then two questions here arise—1st. Had Congress power to emancipate Joe's wife and children? 2d. If that power

existed, was it exercised so as constitutionally to divest the owner of that wife of his legal title to her? ·

1. The Constitution reserves to each State in the Union exclusive power over her own domestic institutions and rela-·tions, and certainly gives to Congress no power over slavery in a slaveholding State. In England and her colonies, where there is no fundamental guaranty, as here, of all or any property, and where parliament is politically omnipotent, and none of its acts can therefore be adjudged unconstitutional, legislative acts might take private property and emancipate colonial slaves without compensation; and, in a slaveholding colony, a commanding general, in a civil war, might abolish slavery as a war measure. But, during the late rebellion for dissolving our political union, could a Federal general, commanding an army in Tennessee, fighting *under the national Constitution, and in vindication of its integrity and supremacy*, have had rightful power to violate its guarantees by emancipating all the slaves in that State? We think not. Insurgent citizens of Tennessee were still, *de jure*, citizens of the United States—they were not *national* belligerents—they were not absolved from their original obligations to the Federal Constitution as their supreme law, nor deprived of their title to its protection; and the suppression of the insurrection neither needed nor authorized the abolition of *all* the slaves in their State by the Federal government. And how could it have needed or justified the emancipation, by Federal power, of the slaves of union men who were fighting to preserve the Constitution and save the union? · The belligerent power of either party, *in an international war*, may abolish slavery in the enemy's country. But, in a civil war, altogether domestic, if the common Constitution be supreme, as ours is, and guarantees protection to slave property as ours does, there can be neither military nor civil power in the national government to abolish it, for thereby the Constitution would be violated, and, as already suggested, it is the supreme, or highest human law, in war as well as peace.

But however all this may be, under what pretense could Congress assume power to abolish slavery in Kentucky, a

devoted union State, always for a *restoration* of the union, and *nothing more nor less*, by the war which rebellion made necessary, and as freely and gallantly as any other State shedding her blood to uphold the national charter of union, and, by saving *it* from degradation, to save the union itself from dismemberment? Congress has never exercised, nor, so far as we know, ever claimed, to the full extent, any such power. But, without asserting a power so comprehensive and groundless, Congress assumed the power to enlist slaves as soldiers, and the incidental power to emancipate all such soldiers, and, as "necessary and proper means" to the end of enlistment, the implied power to emancipate their wives and children. The authority to accomplish all this we cannot see nor concede.

Waiving the policy, with which this court has nothing to do, or, therefore, to say, we admit the mere power to take slaves into the military service as any other private property taken for any other public use. But we gravely doubt, and, therefore, cannot admit, the power to take more than the use of a slave during the prescribed period of military service. Consequently, we are not prepared to acknowledge the power to emancipate the soldier slave. But a concession of that power would not extend its principle to the soldier's "wife, children, and friends"—*all* in the some category of motive power, *and none of which motivity would apply to a drafted soldier whose own will does not move him.* And why was it either necessary or proper to substitute the far more expensive process of volunteering, and even without a *legal* will? The anomalous character of the whole procedure might induce an apprehension that the object was, not to supply soldiers that could not be otherwise as certainly obtained, but only to cripple slavery, and inaugurate the ultimate abolition of it. Had this been the avowed and only purpose, the act was unauthorized. But this court must look only to the power and never presume an unconstitutional motive for its exercise, as properly adjudged by the United States supreme court in Fletcher vs. Peck. Whatever may have been the motive, it was not more difficult to draft slaves than free men; and volunteering, even at

the same cost, would have left no excuse for superadding the extraordinary *bonus* of the freedom of the wives and children of slave husbands and fathers who would volunteer as soldiers. That costly and invidious burden, imposed on comparatively a few men for the benefit of all the public, was not only unnecessary, but was unconstitutional on account of its glaring inequalty. As well might Congress saddle one man, or one class of men, with the whole burden of the public debt; for this, though much more oppressive in degree, is the same in principle, policy, and justice. The children and wives of some of those soldiers might have been worth many thousands of dollars—and why should the owner of such a family be required to contribute so large a sum for the enlistment of one black soldier, who might have been enlisted for no more than the much lighter cost of a white soldier? The government must pay the owner of an enlisted slave his value, and, to that extent, he costs so much more than a free soldier; and, if the black soldier have a wife or children, or both, *their* value augments the cost of his enlistment so as to make it, relatively to that of a free white soldier, enormous.

But, as already suggested, the government repudiates any compensation to the owner of the black soldier's wife and children, and, thereby, leaving him without compensation, taxes him that much more than the mass of other citizens whose means may be ampler than his.

The emancipation of wives and children cannot be either a necessary or proper mean to the end of enlisting soldiers—freedom to all the enslaved friends of the black volunteer would be a still more persuasive *bonus*, and a right to his master's land, worth in some cases $100,000, would be even more tempting; and surely, if any one of these means be constitutional, the others are equally so. No one of them is constitutional. But the one adopted effected the object contemplated, and *now* it may not be important to former owners of slaves, generally, whether it was constitutional or not. But this case must be decided; the decision depends on a constitutional question, and our duty is not only to decide it but to decide it according to our *own* judgment.

Corbin vs. Marsh.

2d. But if we are mistaken in the opinion that the emancipation of the wives and children of enlisted slaves was not necessary means to a constitutional end, we are, nevertheless, satisfied, that, without compensation either paid, secured, or promised, the owner in this case was never divested of his title to *Joe's* wife.

The Federal guarantee of private property against the power of the government is substantially incorporated in every State constitution. And while the national and every State judiciary have concurred in the opinion that compensation, to the extent of the value of the property, is indispensable to the lawfulness of the taking of it by the government, State or national, for public use, there is some diversity among them as to the necessary time and mode of making that compensation—some requiring prepayment, others considering such payment either made or " *secured* " sufficient, but not defining the security. Our own opinion is, that, as a citizen cannot coerce the government nor compel it to make an appropriation of money to pay him, its mere promise, either expressed or implied, is not a fulfillment of the conservative purpose of the guarantee, because any other construction might often evade the object and nullify the provisions of it, and thus defeat the end it aimed to accomplish. But however this may be, pay must be assured. What kind of security would be equivalent to payment is a metaphysical question hard to solve, and respecting which different minds would essentially differ. In cases of extreme necessity, when the public interest requires the use of private property before the ascertainment and payment of its value can, consistently with that interest, be conveniently made, the owner must submit to the temporary privation on the principle that individual interest must yield to public necessity, as in cases of private houses torn down in a city to save other houses from combustion—of private property destroyed to prevent a public enemy from taking it—or of *jettison* for saving a ship, and as much else as possible, by throwing overboard as much of the freight as necessary for that end. But, in all such cases, the owner of the property so taken from him is indisputably entitled to indemnity. In the case of

property destroyed by the government, the loser must be indemnified by the government; and in the city and marine cases, suits in equity, *against the persons benefited*, may, as conclusively adjudged, be maintained for *pro rata* contribution. In all such cases, the necessity which overrules the law's *defense* does not impair its power of retribution. And this is all that *Hamilton* and *Madison* meant, when, in the Federalist, they spoke of the irresistible power of military necessity, whose individual wrongs no constitutional barrier could prevent, but constitutional guarantees might repair. If a horse, or slave, or house be taken by the government and applied to public use, until just compensation shall have been made, the owner, though deprived of the possession against his will, yet retains the title and the incidental right of re-entry or recaption, as a security for payment, unless, in a reasonable time, the value shall have been legally fixed and paid or offered.

In Haight vs. Morris (*4th W. C. C. R.*), Justice Washington, of the supreme court of the United States, adjudged that " until full *indemnity* is afforded the party, the power of taking his property cannot be exercised—and chancery will grant an injunction to stay proceedings until indemnity." Justice Baldwin, of the same court, decided the same thing. (*1st Bald.*, 203.) And *Chancellor Kent* indorsed the same doctrine. (*2d J. Ch. R.*, 162.)

These concurrent opinions of eminent jurists clearly imply that, until indemnity, the owner is not divested of *his title*, and, as his best security, may enjoin a disturbance of his possession—and, of course, if possession be prematurely and wrongfully taken from him, his title does not go with it.

The fact that a slave is a *person*, does not qualify the owner's right of *property*, nor entitle the government to any more right to take that property than any other kind; nor does the fact that, in countries where there is no constitutional inhibition, and even in the American colonies and Confederate States, before the adoption of the Federal Constitution, slaves enlisted as soldiers were sometimes emancipated, does not prove that, under our Constitution, the same thing can be lawfully done; and certainly does not *tend* to

prove that such soldiers' wives are in the same category; nor does the fact that a portion of the section, which contains the unqualified guarantee of private property, qualifies, in time of war, other general guarantees of some other rights, tend to show that any qualification of the guarantee of property was intended; but the tendency is the other way, implying that, whenever a general guarantee was intended to be modified by war, the Constitution so provided expressly, as we before stated, and as may be illustrated in other instances. This alone would be a sufficient answer to the assumption that the war power is unlimited by constitutional restrictions.

In this case there was, as to Joe's wife, neither any unavoidable necessity for her instant liberation, nor any compensation provided; but Congress negatived all purpose to pay or provide for paying her owner anything. We are clearly satisfied, for the foregoing reasons, that her owner's title was not divested by act of Congress. No martial law, properly defined, could have emancipated her. And there is no pretense of any such emancipation.

We repeat, that war, in the whole amplitude of its legitimate powers, cannot legalize what the Constitution prohibits, nor destroy what it guarantees.

Then, in any view we have taken, or can consistently or conscientiously take, of this case, Joe's enlistment did not emancipate his wife nor divest her owner's title to her; and, consequently, he had a legal right to the judgment now sought to be reversed.

Wherefore, the judgment is affirmed.

---

JUDGE WILLIAMS, DISSENTING FROM THE MAJORITY OF THE COURT, DELIVERED THE FOLLOWING OPINION:

HUGHES vs. TODD, Franklin Circuit.

SIMS vs. PEARCE'S ADM'R, Hart Circuit.

CORBIN vs. MARSH, Nicholas Circuit.

These cases differ somewhat in their facts, but so nearly involve kindred questions; as to justify their joint consideration.

Todd executed his note to Hughes for $150, January 2, payable December 25, 1864, for the hire of a slave man Marshall, who left Todd in June, having been recruited as a soldier in the national army.

Sims executed his note to Pearce's administrator for $300, November 30, 1863, payable December 25, 1864, for the hire of three slaves for the year 1864. The two men enlisted as soldiers in the national army, and the woman fled into the military lines, sought and obtained their protection, before the expiration of the year.

Todd and Sims ask an abatement of the hire for the services so lost.

Marsh sued Corbin for a woman, Milly, whom he claims as his slave. Corbin put in for defense that she was the wife of a soldier of the United States, and, by the provisions of the joint resolution of Congress of March 3, 1865, made free, and, as a free woman, by her own voluntary consent was in his employment, to which plaintiff demurred, on the ground that she had not been freed by any constitutional and valid enactment of Congress, and which demurrer the court sustained.

These cases, therefore, involve the constitutionality of the various acts of Congress relative to the enlistment of colored soldiers, and the freedom of themselves, wives, and children, unless the hirers are bound to pay at all events.

This court has uniformly held that the employer was bound for the promised price, though the slave might sicken, die, or flee after he got possession, unless he provided against these contingencies by express stipulations; and though this rule has been so long established and uniformly upheld as to be regarded inveterate, yet the philosophy of the rule, and the reasoning by which it has been sustained, are not so entirely satisfactory as to require its further extension; besides, the weight of authority in the other slave States is certainly against it.

That an abatement should be allowed from the deprivation, where it has resulted from the act or effect of law, both to the

lessee of real estate and hirer or bailee of personalty, seems to be sustained both upon principle and authority.

"If, therefore, the tenant be deprived of the thing letten, the obligation to pay rent ceases, because such obligation has its force only from the consideration which is the enjoyment of the premises. * * * From this principle it follows, that if the land be recovered by a third person by a title superior to the lessor's, the tenant is discharged from the payment of rent after the eviction." (*Taylor on Landlord and Tenant*, 183.)

"If the tenant's interest in part of the premises is extinguished by the act of the parties, *by act of law*, or by the act of God, the rent will be apportioned. As where a portion of the premises is taken, by *public authority*, for the opening and widening of streets, the tenant is entitled to an abatement of rent." (*Same*, 186.)

The Congress of the United States, by an act approved July 17th, 1862, authorized the President "to receive into the service of the United States, for the purpose of constructing intrenchments, or performing camp service, or any other labor, or any military or naval service for which they may be found competent, persons of African descent."

Another section of this act provides, that where any man or boy of African descent shall owe service to any one then levying war on the United States, and that such man or boy shall render service as provided for in this act, that he, his mother, wife, and children, shall forever thereafter be free.

By a supplemental act of February 24, 1864, it is enacted, among other things, that "All able-bodied male colored persons between the ages of twenty and forty-five years, resident in the United States, shall be enrolled according to the provisions of this act, and of the act to which this is an amendment, and form part of the national forces; and when a slave of a loyal master shall be drafted and mustered into the service of the United States, his master shall have a certificate thereof; and, thereupon, such slave shall be free, and the bounty of one hundred dollars, now payable by law for each drafted man, shall be paid to the person to whom such drafted

person was owing service or labor at the time of his muster into the service of the United States. The Secretary of War shall appoint a commission in each slave State represented in Congress, charged to award to each loyal person to whom a colored volunteer may owe service a just compensation, not exceeding three hundred dollars, for each such colored volunteer, payable out of the fund derived from commutations; and every such colored volunteer, on being mustered into service, shall be free. And in all cases where men of color have been heretofore enlisted, or have volunteered in the military service of the United States, all the provisions of this act, so far as the payment of bounty and compensation are provided, shall be equally applicable as to those who may be hereafter recruited."

By a joint resolution of Congress, " To encourage enlistments and to promote the efficiency of the military forces of the United States," approved March 3, 1865, it is provided, " That the wife and children, if any he have, of any person that has been or may be mustered into the military or naval service of the United States, shall, from and after its passage, be forever free, any law, usage, or custom whatsoever to the contrary notwithstanding."

It further provides what acts shall be sufficient evidence of the relation of wife or child.

These various acts were for the purpose of increasing the military strength and efficiency of the armies and navies of the United States; whether appropriate for such purposes and demanded by the public necessity, depends on the current and accredited facts of this historical period.

Between the first election of President Lincoln, November, 1860, and his inauguration, March 4, 1861, the States of South Carolina, Georgia, Mississippi, Louisiana, Alabama, and Texas, passed secession ordinances. South Carolina issued her declaration of independence December 20th, 1860; her Governor appointed a full cabinet, consisting of secretaries of state, of war, of treasury, of navy, of interior, and postmaster general, and January 14, 1861, her Legislature resolved that any attempt by the United States government to rein-

force Fort Sumpter would be considered an "act of open hostility and a declaration of war." Her authorities seized Fort Moultrie and Castle Pinckney, light-house tender, and schooner Wm. Aiken, the United States arsenal, post-office, and custom-house, Charleston, 70,000 stand of arms, and steamer Mariana, and January 9, 1861, fired on the United States vessel, "Star of the West," transporting provisions to the United States garrison then in Fort Sumpter.

The authorities of Georgia seized Forts Pulaski and Jackson and arsenal, two howitzers, two cannon, 22,000 muskets and rifles, with large stores of powder, balls, grape, &c., the United States steamer Ida, the money in possession of the United States collector of customs, and eight vessels belonging to the citizens of New York.

The authorities of Florida seized the United States navyyard, and Forts Barrancas and McRea, the arsenals at St. Augustine and Chattahoochie, with 500,000 rounds of musket and 300,000 rifle cartridges, 50,000 pounds of powder, and the coast survey schooner F. W. Dana.

The authorities of Alabama seized Fort Morgan, with 5,000 shot and shell, Mt. Vernon arsenal, with 20,000 stand of arms, 150,000 pounds of powder, some cannon, with large amounts of munitions of war, and the revenue cutter Lewis Cass.

The authorities of Mississippi seized the United States fort at Ship Island, and hospital on the Mississippi river.

The authorities of Louisiana seized Forts Jackson, St. Phillip, and Pike, arsenal at Baton Rouge, with 50,000 small arms, 4 howitzers, 20 pieces of heavy ordnance, 2 batteries, 300 barrels powder, hospital at New Orleans, with all the quartermaster and commissary stores, revenue cutter McClelland, mint and custom-house, New Orleans, with $599,303 in gold and silver coin.

The authorities of Texas seized the United States guns and stores on the steamship Texas, Forts Chadburne and Belknap, with all the property of the Overland Mail Company, all the United States stores, consisting of $55,000 in specie, 35,000 stand of arms, 20 pieces of mounted and 44 pieces of dismounted artillery, ammunition, horses, wagons, forage,

&c., estimated at $1,300,000, revenue cutter Dodge; also Fort Brown.

The authorities of Arkansas seized the arsenal at Little Rock, with 9,000 small arms and 40 cannon, with large quantities of ammunition. (*McPherson's History of the Rebellion, pp.* 27–8.)

These States had assembled in a common Congress at Montgomery, Ala., had adopted a common central government, made a president and vice president, invested them with immense powers, and, four days before President Lincoln's first inauguration, enacted a statute—

1st. To enable the government of the Confederate States to maintain its jurisdiction over all questions of *peace* and *war*, and to provide for the *public defense.*

2d. To authorize the president to receive from the several States the *arms* and *munitions* of *war* which have been acquired from the United States.

3d. To receive from the States such forces in their service as may be tendered, in such numbers as he may require, for not less than twelve months, unless sooner discharged.

And, two days after President Lincoln's inauguration, said Confederate Congress enacted a statute authorizing their president to employ the *militia, military*, and *naval* forces of the Confederate States, to the extent of one hundred thousand men, to repel *invasion, maintain* rightful possession of the territory, and secure the public tranquility and *independence* against threatened assault. (*McPherson's History of the Rebellion*, 117.

Thus these seceded States denied their allegiance to the Constitution of the United States, denied that they constituted any part of its government, repudiated its authority in any manner over them, expelled its officers, seized the public property of the government and the private property of its loyal people, captured and imprisoned its loyal citizens, erected a hostile central government within its jurisdiction, prepared for hostilities, and finally formally declared war against the free States of the Republic; and with hostile forces invaded the territory of the loyal States, especially

Kentucky, and with force set up on her territory and within her jurisdiction a hostile, revolutionary State provisional government, which forcibly took jurisdiction of a part of her territory, superseded the legitimate officers of the real State government, seized her revenues, robbed her banks, destroyed her railroads, despoiled her citizens, subverted the liberty of her loyal people, sent a representation to the rebel Congress, and by force attempted to overthrow the legitimate State government. Can it be possible that all these revolutionary and hostile acts could be perpetrated and yet no war levied upon the United States government?

"A civil war is when a party arises in a State which no longer obeys the sovereign, and is sufficiently strong to make head against him, or when in a republic the nation is divided into two opposite factions, and both sides take up arms. Usage applies the term civil war to every war between members of the same political society. If it is between a part of the citizens on the one side, and the sovereign and those who obey him on the other, it is sufficient that the malcontents have some reason to take up arms, in order that the disturbance should be called civil war, and not rebellion. * * * Civil war breaks the bonds of society and of government; it gives rise in a nation to two independent parties. They are in the position of two nations who engage in disputes and have recourse to arms. * * * When the sovereign has conquered the opposite party and obliged it to demand peace, he may except from the amnesty the authors of the troubles, the chiefs of the party, cause them to be judged according to the laws, and punished if found guilty." (*Lawrence's Wheaton on International Law*, 522–3, and note 171, second annotated edition; *Vattel Droit des Gens.*, LIV III, ch. 18, sects. 290, 295; *Riqulme Elementas de Derecho*, cap. XIV, tom. I, p. 172; *Bello, Principias de Derecho International*, cap. X, p. 267.)

" When the regular course of justice is interrupted by revolt or insurrection, so that the courts cannot be kept open, *civil war exists*, and hostilities may be prosecuted on the same footing as if those opposing the government were foreign enemies." (*Schooner Brilliante vs. United States, and other*

*prize cases in the Supreme Court U. S., December term,* 1862; 2 *Black.,* 667.)

"As a civil war is never publicly proclaimed, *eo nomine,* against insurgents, its actual existence is a fact in our domestic history which the court is bound to notice and to know." (*Same,* 667.)

Thus war had been levied on the national government, and it was called on to defend its authority, to enforce its laws, and preserve its existence, and to engage in a defensive conflict, with the full justification of all the writers on the laws of nations, and approval of the highest judicial forum of our own country.

But before the *public necessity* of exerting all the war powers conferred and recognized by the Constitution can be fully appreciated, it will be necessary further to examine some of the acts of the insurgent States and their government.

The Tennessee Legislature, very soon after its "separation act," June 28, 1861, enacted a statute, the first section of which provides, "that from and after the passage of this act the Governor shall be, and hè is hereby, authorized, at his discretion, to receive into the military service of the State all male *free persons of color* between the age of fifteen and fifty." (*McPher. Hist. Reb.,* 281.)

In the Memphis, Tennessee, newspapers of September 9, 10, and 11, as the effect of this enactment, may be found the following notice:

"ATTENTION VOLUNTEERS.

"*Resolved by the Committee of Safety,* That C. Deloach, D. R. Cook, and W. B. Greenlaw, be authorized to organize a volunteer company, *composed* of our patriotic *free men of color,* of the city of Memphis, for the service of our common defense. All who have not enrolled their names will call at the office of W. B. Greenlaw & Co.

F. TITUS, *President.*

"F. W. FORSYTHE, *Secretary.*"

On the preceding days of the same month, these papers gave accounts of thousands of negro slaves, armed with

spades, pick-axes, &c., being marched through Memphis in military order, under the command of military officers, bound for various places where the insurgent armies were stationed, or where the insurgents were erecting fortifications, &c. (*McPher. Hist. Reb.*, 281.)

And on the same page will be found the following account of a review, taken from the New Orleans telegram:

"NEW ORLEANS, November 23, 1861.

" Over twenty-eight thousand *troops* were reviewed to-day by Governor Moore, Major General Lovell, and Brigadier General Ruggles. The line was over seven miles long; *one regiment comprised fourteen hundred free colored men.*"

It is also a part of the historical, notorious, and accredited facts of the rebellion, that the insurgents, at the very commencement of the war, in all their States, employed vast numbers of their slaves in their military service, for many belligerent purposes, such as the digging intrenchments, erecting forts, breastworks, barracks, and such camp service as were necessary to the protection, efficiency, and support of their armies.

Virginia commenced legislating on the subject of the enrollment of her free negroes for military service so early as February 4, 1862. (*McPher. Hist. Reb.*, 281.)

It is also a part of the notorious and accredited historical facts of this period, that many thousands of the slaves of Tennessee and Kentucky had been employed by the insurgents on their fortifications at Forts Henry, Donelson, Nashville, and Island No. 10, in Tennessee, and Columbus and Bowling Green, Kentucky, before the date of said first enactment of the Congress of the United States.

Besides, the productive labor of near four millions of slaves contributed vastly to the sustenance of the insurgent armies and support of the insurgent government.

Production is as essential to the support of a government, and the sustenance of its armies, as are soldiers for its defense; and observation has taught all reflecting minds that four millions of slaves furnish many more producers than an equal number of free white population, because their boys

and girls are put to labor at a much earlier age, and their women make farm hands, whilst no time is lost or expense incurred in education, and their diet and clothing being plain, their consumption not near so costly.

Moreover, the insurgent government had greatly increased its military power by the acquisition of Tennessee and Virginia, and a large number of those within military age from Missouri, Kentucky, and Maryland.

Thus the national government found itself assailed, not only by the white population of eleven States, and large portions from the three loyal States named, but also from the involuntary assistance of the slave population of all these States.

Upon these, as a part of the notorious accredited facts, the government and people were called to act; and with these in full view, as Mr. Whiting has well said, in his examinations of the war powers, we must leave behind us the body of laws regulating the rights, liabilities, and duties of citizens in times of public tranquility, and turn our attention to the *reserved* and hitherto *unused* powers contained in the Constitution. We must enter and explore the arsenal and armory, with all their implements of defense, which our forefathers wisely inclosed within the castle walls of the Constitution for the protection and safety of the republic.

It is said by Kent (2 *vol. Com., part V, sec. XXXIV, p.* 397) that " There are many cases in which the rights of property must be made subservient to the public welfare.

" The maxim of law is, that a private mischief is to be endured rather than a public inconvenience.

" On this ground rests the rights of *public necessity.* * * * So, it is lawful to raze houses to the ground to prevent the spreading of a conflagration. These are cases of urgent necessity, in which no action lay at common law by the individual who sustained the injury; but private property must in many other instances yield to the general interest." " The right to destroy property in cases of extreme emergency, as to prevent the spread of a conflagration, is not the exercise of the right of eminent domain, nor the taking it for public

use; but is a right existing at common law, founded on the plea of necessity, and may be exercised by individuals." (*American Print Works vs. Laurens*, 1 *Zabriskie N. J. R.*, 248, note 2; 2 *Kent's Com.*, 398.)

To "provide for the common defense and general welfare" is a power conferred and duty enjoined on Congress by article 1, section 8, Constitution United States, the more thoroughly defined by the more specific but unlimited grants to Congress which follow in the same section:

"To declare war.

"To raise and support armies.

"To provide and maintain a navy.

"To make rules for the government and regulation of the land and naval forces.

"To provide for calling forth the militia to *execute the laws of the union, suppress insurrection,* and repel invasions.

"To provide for organizing, arming, and disciplining the militia, &c.

"To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or any department or officer thereof."

The right of self-defense and self-preservation, including the necessary means to its efficient exercise, is alike inherent, and as perfect in government as in the individual. These vast powers, thus conferred upon Congress, were neither the extension nor abridgment of these natural rights, but the simple conferring them upon the legislative department as being the safest depository to the people.

This right of self-protection and preservation in the government can no more be defined and limited, compatible with its existence and perpetuity, than can the right of the individual to protect his own life, but each must be left with the unabridged right to act according to the circumstances of each emergency.

It would have indeed been wonderful if the wise men of the convention, in making a Constitution of government designed to be perpetual, had, through a timid fear that the

people's representatives would betray the people's rights, have withheld from the government the essential power for its protection, or so limited it as to destroy its efficiency, and render it impotent.

When the Constitution was submitted to the people for their ratification, it was violently assailed by its opponents, and warmly defended by its friends. These differed widely as to the meaning of many provisions, and as to many powers conferred; but as to the omnipotent character of the war powers, they agreed, and differed only as to their necessity. This led to the publication of the articles known as the "Federalist," which, by jurists and statesmen, are regarded as little less than authoritative. And in this light, and with this understanding, the people adopted the Constitution.

It is said by Mr. Hamilton, No. 23, Federalist, p. 106, that "the principal purposes to be answered by the union, are these: the common defense of the members; the preservation of the public peace, as well against internal convulsions as external attacks. * * * The authorities essential to the care of the common defense are these: to raise armies; to build and equip fleets; to prescribe rules for the government of both; to direct their operations; to provide for their support. *These powers ought to exist without limitation;* because it is impossible to foresee or to define the extent or variety of national exigencies, and the corresponding extent and variety of the means which may be necessary to satisfy them." "The circumstances which endanger the safety of nations are infinite; and, for this reason, no constitutional shackels can wisely be imposed on the power to which the care of it is committed. This power ought to be coextensive with all the possible combinations of such circumstances; and ought to be under the direction of the councils which are appointed to preside over the common defense. * * * It rests upon axioms as simple as they are universal—the *means* ought to be proportioned to the *end;* the persons from whose agency the attainment of any *end* is expected, ought to possess the *means* by which it is to be attained."

Again, in No. 26, Federalist, 118–19, he says : " The idea
of restraining the legislative authority in the means for pro-
viding for the national defense, is one of those refinements
which owe their origin to a zeal for liberty more ardent than
enlightened."

Again, in No. 28, Federalist, 126–7, he says: " That there
may happen cases in which the national government may be
under the necessity of resorting to force, cannot be denied.
Our own experience has corroborated the lessons taught by
the example of other nations; that emergencies of this sort
will sometimes exist in all societies, however constituted;
that seditions and insurrections are, unhappily, maladies as
inseparable from the body-politic as tumors and eruptions
from the natural body; that the idea of governing at all
times by the simple force of law (which we have been told
is the only admissible principle in republican government),
has no place but in the revery of those political doctors
whose sagacity disdains the admonitions of experimental
instructions."

Mr. Madison, in No. 41, Federalist, 191, says: " Security
against foreign danger is one of the primitive objects of civil
society.   The powers requisite for attaining it must be effect-
ually confided to the federal councils.

" Is the power of declaring war necessary?   *   *   The
existing confederation established this power in the most
ample form.   Is the power of raising armies and equipping
fleets necessary?   This is involved in the foregoing power.
*It is involved in the power of self-defense.*

" But was it necessary to give an INDEFINITE POWER
of raising TROOPS, as well as providing fleets; and of main-
taining both in PEACE as well as WAR?   *   *   *   With
what color of propriety could the *force necessary for defense be
limited, by those who cannot limit the force of offense?*

" If a Federal Constitution could chain the ambition, or set
bounds to the exertions of all other nations, then, indeed,
might it prudently *chain the discretion of its own government, and
set bounds to the exertions for its own safety.*   *   *   *   The
*means* of security can *only* be *regulated* by the *means* and *dan-*

*ger* of *attack. They will, in fact, be ever determined* by *these rules, and by no others. It is in vain to oppose constitutional barriers to the impulses of self-preservation."*

Again, in No. 45, Federalist, 218, Mr. Madison says: "Was, then, the American revolution effected, was the American confederation formed, was the precious blood of thousands spilt, and the hard-earned substance of millions lavished, not that the *people* of America should enjoy *peace, liberty,* and *safety,* but that the government of the individual States, that particular municipal establishments, *might enjoy a certain extent of power,* and be *arrayed with certain dignities and attributes* of sovereignty? * * * * Were the plan of the convention adverse to the public happiness, my voice would be, reject the plan. Were the union itself inconsistent with the public happiness, it would be, abolish the union. In like manner, as far *as the sovereignty of the States* cannot be reconciled to the happiness of the people, the voice of every good citizen must be. Let the former be sacrificed to the latter."

Slaves are regarded by all the slave States as *both persons* and property. As persons, their lives are protected by denouncing their murder as a capital offense; as persons, they are punished for offenses, and as such they are made competent witnesses in certain cases; they are also regarded as property, and their owners' rights protected by various laws, and its descent regulated by law.

The Constitution of the United States regards them as persons "held to service and labor." (*Art.* 4, *sec.* 2.) Slaves, therefore, sustain the two-fold relation of *persons* and *property* towards society and the government, which attaches to no other class of property, and which must needs give the government power over them of a different character from any other property.

Armies must consist of *persons;* but whether *free* or *slave, white* or *black,* has not been designated in the Constitution.

The power to raise and support armies, provide and maintain navies, as to *age, color,* or *condition* of the soldier and sailor, rests as fully within the discretion of Congress as does

the *age, color*, or condition of the arms and vessel with which the soldier and sailor is to be equipped.

The power to declare of whom the national forces shall consist, though indefinite and unlimited, is still clearly vested in Congress by the Constitution.

The terms " held to service or labor" equally embrace the white apprentice bound for a term of years as the black who may be bound for life; the master of the white apprentice has as well-defined and legal claim for the term, as the master of the slave has for life; yet the right to take the white apprentice for military purposes, without his master's consent, is scarcely denied, and has been judicially recognized.

The parent has not only the right to the service of his minor children, but he also has the sacred right to their society and pupilage; and so tender regard does the law pay to those parental rights, that, with the most unbounded right to worship God according to the dictates of conscience, it has been often judicially determined that the reception into its membership, by a church, of the minor child, against the parent's consent, is a violation of his legal parental rights.

Yet the right of the government to the military service of the minor son, even against the parent's protest, has been often judicially affirmed, and now scarcely questioned by any. It is hard to perceive the constitutional power of Congress to impress the minor son, tear him from the home and protection and service of the father, and yet deny the constitutional right to do so with the father's slave. If, indeed, the government has the power in the one, but lacks it in the other case, then it may be truly said that, in times of great public commotion and danger, the slave's life is better protected than that of either the master or the master's son, and that the Constitution pays a more tender regard to property than to life.

But with us the home is regarded as the castle of every freeman, and on its threshold and sacred rights none may obtrude against the owner's consent; yet he may be lawfully turned from this sacred retreat, and the house that sheltered his family razed to the ground, the field and farm that yielded

them sustenance fortified, ditched, and despoiled, for the higher and holier purpose of protecting the government. *Is it possible that the Constitution gives to slave property a sanctity unknown to the house and home?*

And in this conflict between the rights and interest of the government and the owner, whether the government shall regard the slave as a person, and, as such, demand his military services, or the property rights alone of the owner be regarded, can it be -at all unreasonable that the government should act for the public good of the whole people, and according to the public necessity?

The right to impress both persons and property into the military service of the government is justified upon the propriety and evidence of this plain proposition, "that every government ought to contain within itself the means of its own preservation."

But the power and propriety of giving freedom, even conceding the right of impressment, is denied; the history of the belligerents of others, as well as our own country, will aid in the solution of this constitutional problem.

Mr. Bancroft (*vol.* 7, *p.* 421, *History of the United States*) says of the battle of Bunker Hill: "Nor should history forget to record, that, as in the army at Cambridge, so also in this gallant band, the free negroes of the Colony had their representatives. For the right of free negroes to bear arms in the public defense was at that day as little disputed in New England as their other rights. They took their places, not in separate corps, but in the ranks with the white men; and their names may be read on the pension-rolls of the country, side by side with those of other soldiers."

Rev. S. K. Lathrop, D. D. (*Memoirs of William Lawrence, pp.* 8, 9), says of Maj. Sam'l Lawrence, who served through the Revolution: "At one time he commanded a company whose rank and file were all *negroes*, of whose courage, military discipline, and fidelity, he always spoke with respect."

General Washington wrote to the President of Congress, December 31, 1775: "It has been represented to me that the free negroes who have served in this army are being much

dissatisfied at being discarded. As it is to be apprehended that they may seek employment in the ministerial army, I have presumed to depart from the resolution respecting them, and have given license for their enlistment. If this is disapproved of by Congress, I will put a stop to it." (*Sparks' Washington, vol.* 3, *p.* 218–19.)

January 16, 1776, Congress decided that these might be enlisted. (*Jour. Con., vol.* 2, *p.* 26.)

A Hessian officer, in his journal of date October 23, 1777, says: "The negro can take the field instead of his master; and, therefore, no regiment is to be seen in which there are not negroes in abundance; and among them are able-bodied, strong, and brave fellows." (*Schloezer's Briefwichsel, vol.* 4, *p.* 365.)

The General Assembly of Rhode Island, February session, 1778, resolved: "Whereas, for the preservation of the rights and liberties of the United States, it is necessary that the whole *powers* of *government* should be exerted in *recruiting* the continental battalions. * * And whereas, history affords us frequent precedents of the *wisest*, the *freest*, and bravest nations having liberated *their slaves*, and *enlisted* them as *soldiers*, to fight in defense of their country. * * * * It is voted and resolved, that every able-bodied *negro, mulatto*, or *Indian* man slave, in this State, may enlist in said two battalions. * * * That every slave so enlisting shall, upon his passing muster, be immediately *discharged* from the *service* of his *master* or *mistress*, and be *absolutely free*."

Speaking of these identical battalions, Arnold, in his History of Rhode Island (*vol.* 2, *pp.* 427–8), says: "It was in repelling these furious onsets that the newly-raised *black* regiment distinguished itself by deeds of desperate valor."

March 29, 1779, Congress resolved: "That it be recommended to the States of South Carolina and Georgia, that they take measures immediately for raising three thousand able-bodied *negroes.* * * * That every negro who shall well and faithfully serve as a soldier to the end of the war, and shall then return his arms, be *emancipated*, and receive the sum of fifty dollars. (*Secret Jour., vol.* 1, *pp.* 107–10.)

Corbin vs. Marsh.

In Henning's Statutes at Large of Virginia, in 1773, may be found "An act directing the emancipation of certain slaves *who have served* as *soldiers* in this State.

New York, October 24, 1814, passed "An act to authorize the raising of two regiments of *men of color*," to serve in the war with Great Britain.

In Niles' Register, vol. 7, p. 205, is found General Jackson's address to the free colored inhabitants of Louisiana, from his headquarters at Mobile, September 21, 1814, wherein he said: "To every noble-hearted, generous free man of color, volunteering to serve during the present contest with Great Britain, and no longer, there will be paid the same bounty in money and land now received by white soldiers of the United States."

In vol. 7, pp. 345–6, Niles' Register, December 18, 1814, at the close of a review, he addressed them: "Soldiers, the President of the United States shall be informed of your conduct on the present occasion; and the voice of the representatives of the American nation shall applaud your valor, as your general now applauds your ardor."

It is also a notorious fact, that General Jackson, previous to the battle of January 8, 1815, impressed a large number of slaves at New Orleans, and set them to erecting defenses; and whilst so employed, many of them were killed by the enemy's shot; and his action was approved by President Madison, the Cabinet, and Congress. (*Whiting's War Powers*, *p. 75*.)

In Allison's History of Europe, English edition, vol. 13, p. 434, will be found an account of the taking possession of Tangiers Island, about the middle of August, 1814, by the British forces under General Ross and Admiral Cockburn. This island is within one hundred miles of the capital of the nation. Here, Mr. Allison says, they "invited at the same time the negroes in the adjoining provinces to join the British force in the island, and offering them emancipation in the event of their doing so. Seventeen hundred speedily appeared, and were enrolled and disciplined, *and proved of no small service* in subsequent operations."

All the States and cities of Greece used their slaves as soldiers. Their slaves fought for them on the battle-field of Marathon, and were emancipated for their services.

The Romans, in the palmiest days of their power, so used their slaves. In the war between Rome and Carthage, which, after the battle of Cannæ, was one of mastery to the victors and subjugation to the vanquished, Quintius Fabius, whose legions consisted mainly of the volunteer slaves of Rome, the day before his most decisive and destructive victory over the Carthagenians, proclaimed, by the consent of the Roman Senate and Consul Marcellus, at the head of his army, the freedom of all who should bravely bear themselves in the coming conflict. (*Baker's Livy's Rome, vol.* 3.)

And it may be safely asserted as a historical fact, that all nations have so used their slaves, and have as universally attended such use with emancipation, or recommended it.

Negroes are used as soldiers by the European nations of the present day, even in their slaveholding colonies.

Spain now has a black army on her slaveholding Island of Cuba. Portugal has not only used her slaves in her wars, but now, in her slave colonies on the coast of Africa, her army is chiefly composed of negroes. So at Prince's Island, St. Thomas, and Towanda.

In the Dutch colony on the gold coast of Africa the fortress is garrisoned with a mixture of whites, mulattoes, and blacks, all serving in the same ranks.

The French colony of the Senegal, at St. Louis, is protected by a mixed army of white and black soldiers.

For more than twenty-five years past the Danish slave Island of St. Croix, in the West Indies, has had two corps of black soldiers employed.

So in Brazil and Turkey; and Great Britain now employs a black army in her West Indies, recruited from liberated Africans, captured from the slave-traders' voyages.

General R. E. Lee, Commander and General-in-Chief of all the insurgent forces, in a letter to E. Barksdale, a member of the Confederate Congress, from his headquarters, February

18, 1865, said: "Under good officers and good instruction, I do not see why they should not become soldiers. They possess all the physical qualifications and habits of obedience, which constitute a good foundation for discipline. They furnish more promising material than many armies of which we read in history, which owed their efficiency to discipline alone. *I think those who are employed should be freed.* It would be neither *just* nor *wise*, in my opinion, *to require them to remain as slaves.*" (*McPherson's History of the Rebellion, p.* 611.)

Governor Allen, of Louisiana, in a letter to Seddon, Secretary of War of the insurgent Confederacy, September 26, 1864, in relation to the slaves, said: "*I would free all able to bear arms and put them in the field at once.*" (*Same, p.* 428.)

The insurgent Congress enacted a statute authorizing their President "to ask for and receive from the owners of slaves the services of such able-bodied negro men as he may deem expedient, for and during the war, to perform *military service* in whatever capacity he may direct, and that the General-in-Chief be authorized to organize the said slaves into companies, regiments, and brigades. * * * That while employed in the service, the said troops shall receive the same *rations, clothing,* and *compensation* as are allowed to other troops in the same branch of service.

And both the Senators and all the representatives from Kentucky present, voted for this statute. (*McPherson's History of the Rebellion, p.* 612.)

The British used the slaves of the American people in both the revolutionary and war of 1812, and these slaves they never returned; but having stipulated to do so by treaty of peace, they were held responsible in money for their value.

Thus it appears, beyond all question, that in all our wars the slave and free negro population have been considered as a military power, and have been used as such; and however else they may have differed, it is remarkable that on this subject the national government and its loyal people, and the insurgent government, its States and authorities and

people, have agreed with the belligerents of past ages and other countries, and have accordingly used them for belligerent purposes.

With all these numerous instances of all belligerents of all ages and countries, including our own, having used their own slaves in their wars, and as often emancipating them, had the framers of the Constitution intended to exempt the slave population from the war powers, it is certain that it would have been done by a carefully prepared and explicit clause, and not been left to the uncertain rules of construction.

From the earliest period of our English ancestry the military service of the country, as it was the most perilous, and required the greatest capacity for endurance and hardships and gallantry, so it was regarded as the *freest, most honorable*, and *elevated*, and titles held by this service regarded with the most partial favor.   (*Sharswood's Blackstone, book* 2, *pp*. 55, 59, 61.)

Then, upon these points the free and slave States, and the belligerents of all ages and countries, have agreed—

1. That slaves are persons.

2. That slaves and free negroes are a military power.

3. All belligerents have used their own slaves in their military service, and either emancipated them or recommended it.

4. That the war powers of all governments are unlimited, and the rights of self-preservation perfect.

Slaves have no legal right to property, nor compensation for their service, for these are all merged in their owners; therefore government cannot legally compensate the slave for military service whilst a slave, for this would go to the master.   The slave could not be expected to peril his life, make an efficient soldier, or do deeds of daring and gallantry.   These alone are inspired by the higher, nobler sentiments and incentives of the *free man*.

What, indeed, has the slave to fight for?   Not country; not liberty; not wife or child; not property; not even compensation.   That government that would still enslave him, his wife

and children, cannot call him to its standard and defense as a countryman, for he has no rights in common with its free people, white or black; not as a husband, for he has no marital rights recognized by law, nor, indeed, any legal wife; not as a father, for by law he has neither the right to the service, nor society; nor pupilage of his children; not as the owner of house and home or property, for he and all his acquisitions belong to another by law.

Could it be expected that he would fight for a government that would recognize him as a person, alone, for its own selfish purposes and well-being, and for all the other purposes that would appeal to his affections, his pride, his manhood, and gallantry, recognize him alone as a chattel?

Does not the government, indeed, when it appeals to the slave as a *person* to engage in its most arduous and perilous, freest, and most honorable service, in the very nature of. things give him its plighted faith that forever after he shall remain a *person*, and no more be a *chattel?* In receiving him into this dangerous but noble service, can it not legally, *as it does in fact*, destroy all chattel quality in him? Can a congregation of slaves, however numerous, be converted into an efficient army of soldiers, upon whose fidelity and bravery the government could or should rely for defense? Could a government rationally expect an army of disciplined, efficient, gallant soldiers, ready to peril their lives in its defense, whilst it still enslaved them, their wives and children? Could it expect the slave to quit the less arduous, less dangerous, and milder discipline of his master, for the more arduous, more dangerous, and more rigorous military discipline of the army? Could it make its war power efficient in the recruiting, organization, and disciplining of such troops, without securing to them freedom?

An intelligent and just answer to these questions, by an enlightened and just public sentiment, will vindicate the justice and wisdom of the government, as the historical facts of this war already do in the amplest manner, and as does also the Constitution, under which the public functionaries acted.

The official statistics, obtained November 8, 1865, from the war department, at Washington City, show that the colored population have furnished in this war 178,735 *soldiers*. Of these, Kentucky has furnished 23,703. It may be safely estimated that, as teamsters, and in the quartermaster's and commissary, and various staff departments, that another hundred thousand have served. Of these soldiers, the free States and Territories have only furnished 34,549, leaving the rest to come from the slave States—nearly all of whom must have been slaves.

Had the insurgents been permitted to keep this vast number of slaves for the purposes of production and other belligerent uses, and the national government been deprived of their services and labor, who can tell the disastrous consequences which might have followed, by the prolongation of the war, and, per possibility, the final success of the rebellion?

It is true that belligerent rights pertain to the government towards the insurgents that it could not legally exercise towards the loyal people and loyal States; but the power to raise armies and provide navies for the defense of the republic peculiarly pertain to it in relation to the loyal people and loyal States; and the justice of the government, in the exercise of this power, is made the more manifest by the statistics of our own State.

By the Adjutant General's report to the Governor of Kentucky of January 1, 1864, schedule C, pp. 15, 16, it will be seen that the entire enrolled militia of the State was 119,577, and the number of soldiers furnished 49,768, or about 42.4 per cent. of the militia. Fifty-two counties furnished their respective per centage and over it. These had 54,485 militia, and furnished 35,068 soldiers, or about 64.3 per cent. of their militia. The remaining fifty-eight counties had 65,692 enrolled militia, but had furnished only 14,700 soldiers, or about 22.3 per cent. of their militia.

It will be further seen, by consulting the *Auditor's* report of 1861, that these fifty-two counties, which had furnished such a large per centage of their militia to the State and government for their defense, had only 65,064 slaves, or about

29 per cent. of the entire slave population of the State; whilst the fifty-eight counties which had furnished such a small per centage of their militia as soldiers, had 159,729 slaves, or about 71 per cent. of all the slaves of the State. Had the fifty-eight counties furnished an equal percentage of their 65,692 militia as the fifty-two counties, their soldiery would have amounted to 45,108, or 30,408 more than they did furnish.

In this condition, involving services, hardships, sacrifices, life, liberty, nationality, and government, it was but the sheerest justice that the more densely-populated and wealthier slaveholding counties should be required to furnish their entire quota of soldiers for the defense of their homes, property, State and national governments; and having failed to do this from their white, it was eminently proper that it should be done from their slave population; and had they furnished all the negro soldiers from the State, which they did not, still there would have remained a deficit against them.

The Commonwealth and the government, as well as the *wife* and *children*, who depended on the labor and care of the husband and father for support and education, had a greater interest in the lives of the non-slaveholding white citizen than in the slave property of the slaveholders; so the moral, legal, and constitutional aspect of this controversy is with the government in the exercise of this power.

But it is said that these congressional acts are in conflict with the fifth amendment to the United States Constitution, which declares that no person shall " be deprived of *life, liberty, or property without due process of law; nor shall private property be taken for public use without just compensation.*"

The declaration in this amendment that no person shall be deprived of life, liberty, or property, without due process of law, is equivalent to the assertion of such right by due process, and a full recognition of the right of eminent domain which is limited by the next member of the sentence: " nor shall private property be taken for public use without just compensation." But for this limitation on the power to de-

prive of property by due process of law, the government would have had the most absolute power, by due process of law, to take the citizen's property, without compensation, even in times of profound peace.

The very language of this amendment refutes all idea that it was intended or understood to be a limitation on the war powers. Its language is wholly inappropriate for such purpose; but it is just what its language imports—a limitation on the right of eminent domain pertaining to every sovereignty, and the solemn declaration of a great policy of public justice, that the common burthens should be a common charge upon the common fund.

No man's life, or liberty, or property can be taken without due process of law. How can this apply to the legal rights or actions of belligerent armies? Are our generals who may be in command to stop and organize some board of judicature, or get the judgment of some kind of tribunal, before they can assault, and kill, and destroy, and capture a rebel force? Or, after capturing the public armed enemy, must they have the judgment of some kind of legal tribunal before imprisoning them? And must they have a judgment before they can strip the captured prisoner of his private property and hand it over to the government. As absurd as these things may appear, yet, if this amendment is a limitation on the war power, they follow as the necessary legal sequences. And more: the insurgent, by his rebellion, has not relieved himself from his duties and responsibilities to the government, though he has forfeited his rights to its protection and consideration; and this, notwithstanding it may have, for the humane purposes of the war, recognized the insurgent hosts as belligerents. This only postpones its right to treat them as subjects until it suppresses the insurrection; therefore, being still subjects, the rebel soldiers may even claim compensation for their private property so taken for public use, though used for belligerent purposes; because "private property shall not be taken for public use without just compensation." If this amendment really be a limitation on the war powers—and these absurd consequences cannot be answered by saying it is a limitation

for some peculiar purposes; for if it be a limitation at all on the war powers, it is so for all the declared purposes of the amendment, and the concession of the legal right of the government in any single instance, no matter how urgent the necessity, is a concession of the whole question—Congress, and not the courts, must judge of the emergencies.

Military and martial laws are the rules that govern war, armies, force, and turbulence. Civil laws govern peace, courts, and public tranquility. The peaceable rules of the civil law can no more be applied as limitations on the powers of war, armies, force, and turbulence, than can the states of *peace* and *war* be reconciled as existing at the same time.

This amendment was designed as a limitation on those great powers usually exercised in times of public tranquility, when the voice of the courts, through the peaceable process and machinery of the law, can be heard and heeded; but not as a limitation on those great powers essential to the defense of the nation, when the peaceable voice of the law and its courts are stilled in the clangor of arms that shall make the continent to reel beneath the burdens of belligerent hosts, contending for the domain and majesty of an empire.

The tribunals of war consist of generals as judges, soldiers as jurors; their process of shot and shell, bullet and ball; their executions of artillery, rifle, and musketry, to be levied on the blood and bodies of the enemy, amid the blaze and fury of the fight; and just so far as these partake of the nature of civil tribunals and legal process, and no further, is this amendment a limitation on the war powers. No government could safely trust the fate of its armies, indeed, its own existence, to such contingencies as estimate of value and payment for private property, nor the whims, caprices, prejudices, nor mercenary motives of its owners, before it may legally take such private property as may be essential for its military purposes; and if the government cannot provide by law for the taking of such property, without first providing compensation, much less may its subordinate officers legally so take it. The consequence, therefore, would be, that each, in so doing, would become a trespasser, and personally re-

sponsible, no matter how urgent the necessities of the government or its armies.

It is scarcely necessary to say that the States are invested with so few and limited war powers, and even these have been so rarely exercised or adjudicated, and that our State Constitution is so materially different from the United States Constitution in its language, that neither the adjudications of our sister States, nor our own, afford much light on this great subject, indeed, are hardly applicable to it in any particular.

The right to destroy private property to prevent its falling into the enemy's hands has often been recognized by the courts as a legal appropriation to public use; but its legality depends on neither estimate nor payment, nor provision therefor. It does, however, fix the liability of the government. These instances are ample to show that said fifth amendment is in nowise a limitation on the war powers.

But the policy of declaring those laws unconstitutional is as unwise and unjust to the loyal slaveholder, whose slaves have in fact been freed, as the policy of emasculating the war powers, and thereby rendering the government impotent, is destructive to society and to the existence of the government, and unjust to the people and States who desire its perpetuity.

The slave soldiers from Kentucky, even at the price of $300 each, will amount to over seven millions of dollars, the payment and fund being already provided for by law. The other slaves set free by the last enactment may be safely set down at 75,000, and, at the price of $300 each, would amount to over twenty-two millions of dollars. Now, if these slaves have been emancipated by the direct, immediate, legal action of the government, the loyal slaveholder has the great claim of justice on his Government, that whilst he suffers in common with all others, contributes of his earnings and substance equally with all others, that it would be unjust, and contrary to the great policy of public justice declared by the Constitution, that his slave property should also be taken for the public benefit and compensation therefor withheld. If

Corbin vs. Marsh.

these slaves of Kentucky, so freed, should perchance belong to loyal owners, their claims would amount to near thirty millions of dollars, and will be the only savings possible out of the great wreck of his property incident to the rebellion.

Should all these acts of Congress be pronounced unconstitutional, then these slaves have not been made free by law, but are still slaves, and will so remain until, by the adoption of the constitutional amendment, now pending, they shall be declared free; and being so declared by constitutional amendment, no compensation will ever be granted by Congress.

Before claims for thirty millions of dollars, or such amount of this vast sum as may be coming to loyal owners, should be swept off by one fell swoop of the judiciary, it would be well that they should pause, reflect, and calmly survey the ground, and see if, in fact, the legal rights of the government and the loyal slave-owner are not harmonious, and both be the better protected by conceding to the government its full and unlimited war powers, and asking it to conform to its declared policy of public justice.

Moreover, there are many questions confided alone to the judgment and discretion of the political department of the government, as necessary for the preservation of the body-politic, which have been wisely withheld from the judiciary; and within the scope of these may be placed the power to provide for the common defense, to declare war, to raise armies and provide navies, to repel invasion and suppress insurrection.

When the political powers determine and declare there is a war, or invasion, or insurrection, and determine the number and character of the forces necessary, how they shall be equipped and what paid, it is not perceived how the judiciary can unsettle, or in anywise interfere with, such determinations; and such seems to have been judicially and authoritatively determined by the supreme court of the United States.

In the war with Great Britain of 1812, the President called on the Governor of New York for her quota of militia. Mott

failed to appear at the place and time designated by the Governor for rendezvous. Major General Morgan Lewis, in command of the United States forces, ordered a court-martial, which fined Mott $96. Martin, as deputy marshal, took Mott's property to satisfy this fine; whereupon Mott sued him, and he put in these facts for his justification. Justice Story, in delivering the opinion of the court, said:

"The service is a military service, and the command of a military nature; and in such cases, every delay, and every obstacle to efficient and immediate compliance, necessarily tends to jeopard the public interest. While subordinate officers or soldiers are pausing to consider whether they ought to obey, or are scrupulously weighing the evidence of facts upon which the commander-in-chief exercises the right to demand their services, the hostile enterprise may be accomplished, without the means of resistance. If the power of regulating the militia, and commanding its services in times of insurrection and invasion (as has been emphatically said), are natural incidents to the duties of superintending the common defense, and of watching over the internal peace of the Confederacy, these powers must be so construed as to the modes of their exercise as not to defeat the great end in view. If a superior officer has a right to contest the orders of the President upon his own doubts as to the exigencies having arisen, it must be equally the right of every inferior officer and soldier. * * * Such a course would be subversive of all discipline, and expose the best disposed officers to the chances of ruinous litigation. * * * He (the President) is necessarily constituted the judge of the existence of the exigency in the first instance, and is bound to act according to his belief of facts. If he does so act, and decides to call forth the militia, his orders for this purpose are in strict conformity with the provisions of law; and it would seem to follow, as a necessary consequence, that every act done by a subordinate officer, in obedience to such orders, is equally justifiable. The law contemplates that, under such circumstances, power shall be given to carry the orders into effect. The law does not provide for any appeal from the judgment

of the President, or any right in subordinate officers to review his decisions. * * * Wherever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction that the statute constitutes him the *sole* and *exclusive* judge of the existence of those facts." (12 *Wheat.*, 19, *or* 6 *Peters' Cond. R.*, 416–17–18.)

And so where the Constitution has given a discretionary power to Congress to be exercised upon their own opinion of facts, it has constituted them the *sole* and *exclusive* judge The case of Luther vs. Borden *et al.*, sprung out of the Dorr rebellion of Rhode Island in 1842. The Legislature, under the old charter government, had declared martial law. Borden and others, belonging to an infantry company, were ordered by its commander to break into the dwelling of Luther, search it, and arrest him, as being an aider and abettor of the hostile State government of which Dorr claimed to be the Governor.

Chief Justice Taney, in delivering the opinion of the supreme court justifying the acts of the defendants, said; " Moreover, the Constitution of the United States, as far as it has provided for an emergency of this kind, and authorized the general government to interfere in the domestic concerns of a State, has treated the subject as political in its nature, and placed the power in the hands of that department. The fourth section, fourth article, of the United States Constitution, provides that the United States shall guarantee to every State a republican form of government, and shall protect each of them against invasion; and, on application of the Legislature, or of the Executive (when the Legislature cannot be convened), against domestic violence. Under this article it rests with Congress to decide what government is the established one in a State. For as the United States guarantee to each State a republican government, Congress must necessarily decide what government is established in the State before it can determine whether it is republican or not. And when the Senators and Representatives of a State are admitted into the councils of the union, the authority of the government

under which they are appointed, as well as its republican character, is recognized by the proper constitutional authority. And its decision is binding on every department of the government, *and could not be questioned in a judicial tribunal.* \* \* So, too, as relates to the clause in the above mentioned article of the Constitution providing for domestic violence. It rests with Congress to determine on the means proper to be adopted to fulfill this guarantee. \* \* \* The first clause of the first section of the act of February 28, 1795, of which we have been speaking, authorizes the President to call out the militia to repel invasion. It is the second clause which authorizes the call to suppress insurrection against a State government. The power given in each case is the same." (7 *Howard's S. C. R.*, 42-3-4.)

Had the Constitution not conferred such power on Congress, they could not have conferred it on the President; but because Congress possessed this power, the court said it could have vested it in the President or in the court; and having conferred it upon the President, his determination was conclusive upon the judiciary and all other departments of the government.

The guarantee of the republican form of government to each State, the right to admit new States, the right to repel invasion and suppress insurrection, to raise armies and provide navies, with all the incidental powers to effectuate these substantive powers in order to provide for the common defense and general welfare, have been, by the Constitution, wisely committed to the political department of the government, to be uncontrolled in its decisions by the judiciary.

But it may be said that such unlimited powers in Congress and the President are dangerous to the liberties of the people, because liable to great abuse.

This objection has been often and ably refuted. All power is dangerous; for it may be abused. Still discretionary power, in all governments, must rest somewhere. There is no safer depository than the representatives of the people and their States, and the chief magistrate, all of whom are elected immediately by the people or their representatives, and hold for

short stated periods of two, four, and six years, when public disapprobation is sure to work a change.

The frequent election of the members of the House of Representatives itself is a most effectual check upon the usurpation of unauthorized power—made still more secure by requiring all revenue bills to originate therein, and prohibiting any army appropriation for more than two years in advance.

With all these checks and safeguards, and frequent appeals to public approbation, no serious apprehension of danger need reasonably be entertained.

Wherefore, I think the judgment in each of the cases of Sims vs. Pearce's adm'r, and Corbin vs. Marsh, should be reversed, and an abatement of hire allowed to Sims, and the demurrer to Corbin's answer overruled; and the judgment in Hughes vs. Todd should be affirmed, as an abatement of the hire was granted in it.